# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) CRIMINAL NO. 11-40060-JPG ) |
| CLEVELAND J. WHITE FEATHER, | ) ) |
| Defendant. | ) |

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO SUPPRESS

Comes now, the United States of America, by and through Stephen R. Wigginton, United States Attorney for the Southern District of Illinois, and George A. Norwood, Assistant United States Attorney, and for its response to Defendant's Motion to Suppress Statements (Doc. 100), states as follows:

### Facts

On December 2, 2009, Defendant Cleveland Whitefeather killed his cell mate (Robert Running Bear, Jr.) at USP-Marion. Mr. Running Bear's body was discovered in the morning at approximately 8:30 a.m. The Federal Bureau of Investigation (FBI) investigated the crime. On December 2, 2009, at approximately 12:30 p.m., the defendant was brought to a room in the prison for an interview regarding the killing. Present in the room were FBI Special Agent (SA) Ron Bratcher, FBI SA Scott Zmudzinski, and USP-Marion SIS Technician Mark Steinmetz. At approximately 12:34 p.m., the defendant was advised of his *Miranda* rights. At approximately 12:35 p.m., the defendant verbally waived his *Miranda* rights.

The defendant was handcuffed during the interview because at the time he was interviewed by the agents, White Feather was considered to be on Special Housing Unit status pending

investigation. BOP policy directs that inmates on Special Housing Unit status are handcuffed any time they are removed from their living quarters (assigned cell). Since White Feather was removed from the M-unit cell for interview, he was handcuffed. A copy of the *Miranda* form used, as well as a notation that the defendant was handcuffed and unable to sign the document, is attached as Exhibit A.

During the interview, the defendant was calm, coherent, and provided appropriate responses to questions. The defendant did not appear under the influence of any alcohol or drugs. The defendant gave a voluntary statement to the officers. At approximately 1:37 p.m., the defendant was returned to his cell.

Shortly following the defendant's interview with the FBI agents and a BOP official, the defendant was interviewed by a psychologist (Marla Patterson, Ph.D), who works st USP-Marion. The purpose of the interview was for a suicide risk assessment as to the defendant. Dr. Patterson noted that the defendant was "oriented to time, place, person and circumstances." The defendant's speech was coherent, logical, and goal directed. The defendant did not appear to be actively hallucinating and his thought process appeared organized. The defendant's affect was calm and stable. The defendant's cognition and attention appeared intact. The defendant was responsive and alert. Dr. Patterson concluded that the defendant was at a low risk for suicide. When the psychologist interviewed the defendant, he was in his assigned cell in M-unit and therefore was not handcuffed.

Approximately six weeks later, on January 15, 2010, the defendant was interviewed again. Present in the room were FBI SA Ron Bratcher and USP-Marion SIS Technician Mark Steinmetz. At approximately 1:50 p.m., the defendant was advised again of his *Miranda* rights. At

approximately 1:51 p.m., the defendant verbally waived his *Miranda* rights. Per BOP policy, the defendant was handcuffed during the interview. A copy of the *Miranda* form used, as well as a notation that the defendant was handcuffed and unable to sign the document, is attached as Exhibit B.

During the interview, the defendant was calm, coherent, and provided appropriate responses to questions. The defendant did not appear under the influence of any alcohol or drugs. The defendant gave a voluntary statement to the officers.

Finally, the defendant sent a letter to USP-Marion SIS Technician Mark Steinmetz. The date on the letter was January 27, 2010. A copy of that letter is attached as Exhibit C.

The defendant has moved to suppress the foregoing statements that he made. Based upon case authority, none of the statements should be suppressed.

**Legal Analysis**

A person may waive his *Miranda* rights only if the waiver is done "voluntarily, knowingly and intelligently." *United States v. Snodgrass*, 635 F.3d 324, 328 (7th Cir. 2011); *United States v. Carson,* 582 F.3d 827, 833 (7th Cir. 2009). When determining whether a waiver is voluntary, this Court looks to whether, "under all the circumstances, the confession is the 'product of a rational intellect and free will and not the result of physical abuse, psychological abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.' " *United States v. Snodgrass*, 635 F.3d at 328.

Coercion is an essential element, and we determine whether police coerced a suspect by examining the facts of the case, including "the defendant's age, education, intelligence level, and

3

mental state; the length of the defendant's detention, the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *United States v. Snodgrass*, 635 F.3d at 328; *United States v. Huerta,* 239 F.3d 865, 871 (7th Cir.2001)).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011).

Moreover, voluntary statements are not subject to *Miranda* warnings, and thus are admissible as evidence. *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). Statements are volunteered when they are not the result of "compelling influences, psychological ploys, or direct questioning." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (*citing Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987); *United States v. Jackson,* 189 F.3d 502, 510 (7th Cir.1999)).

**1. December 2, 2009 Statements to FBI Agents and a BOP Official**

The defendant's December 2, 2009, statement to FBI agents and a BOP official is admissible. The defendant's statement was a voluntary statement after being provided his *Miranda* rights and waiving his rights.

At the time of the statement, the defendant was 50 years old. According to the defendant's PSR, the defendant obtained a GED in 1977. During the interview, the defendant was alert, calm, and not under the influence of any drugs or alcohol. The interview took approximately one hour. There is no evidence at all of any coercion. There was no physical or mental punishment, or

4

deprivation of food or sleep. The defendant was advised of his rights prior to making a statement and waived his rights.

The defendant's main argument regarding the voluntariness of his confession is that because the defendant was diagnosed as schizophrenic 20-30 years ago, his statement in December 2009 cannot be voluntary. Case authority from the United States Supreme Court holds just the opposite.

In *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), on August 18, 1983, Officer Patrick Anderson of the Denver Police Department was in uniform, but working in an off-duty capacity in downtown Denver. The defendant (Connelly) approached Officer Anderson and, without any prompting, stated that he had murdered someone and wanted to talk about it. Officer Anderson immediately advised respondent that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney prior to any police questioning. The defendant stated that he understood his rights but he still wanted to talk about the murder. Officer Anderson asked Connelly several questions. Connelly denied that he had been drinking, denied that he had been taking any drugs, and stated that, in the past, he had been a patient in several mental hospitals. Officer Anderson again told Connelly that he was under no obligation to say anything. Connelly replied that it was "all right," and that he would talk to Officer Anderson because his conscience had been bothering him. Officer Anderson believed that Connelly appeared to understand fully the nature of his acts.

Shortly thereafter, Homicide Detective Stephen Antuna arrived and Connelly was again advised of his rights. Detective Antuna asked Connelly "what he had on his mind." Connelly answered that he had come all the way from Boston to confess to the murder of a young girl whom Connelly had killed in Denver sometime during November 1982. Connelly detailed his story to

Detective Antuna and Sergeant Thomas Haney, and agreed to take the officers to the scene of the killing. Under Connelly's direction, the two officers and Connelly proceeded in a police vehicle to the location of the crime. Connelly pointed out the exact location of the murder. Throughout this episode, Detective Antuna perceived no indication whatsoever that Connelly was suffering from any kind of mental illness.

During an interview with the public defender's office the following morning, Connelly became visibly disoriented. Connelly began giving confused answers to questions, and for the first time, stated that "voices" had told him to come to Denver and that he had followed the directions of these voices in confessing. Connelly was sent to a state hospital for evaluation. Connelly was initially found incompetent to assist in his own defense. However, by March 1984, the doctors evaluating Connelly determined that he was competent to proceed to trial.

The doctors determined that Connelly was suffering from chronic schizophrenia and was in a psychotic state at least as of August 17, 1983, the day before he confessed. Connelly believed he was following the "voice of God" when he confessed. The doctor opined that Connelly's psychosis motivated his confession.

The Colorado state courts decided that Connelly's confession must be suppressed because they were "involuntary" because of Connelly's mental state. The United States Supreme Court reversed.

The United States Supreme Court held that coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the Due Process Clause. *Colorado v. Connelly*, 479 U.S. at 163-164, 107 S. Ct. at 519-522. The Court said that while a defendant's mental condition may be a factor in the analysis of whether a statement is voluntary, this

does not justify a conclusion that his mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." *Id*.

The Court said:

> Thus the cases considered by this Court over the 50 years since *Brown v. Mississippi* have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. ***But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."***

*Colorado v. Connelly*, 479 U.S. at 163-164, 107 S. Ct. at 520 (citation omitted; emphasis added).

The Court held that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. at 167, 107 S. Ct. at 522. The Court concluded that the taking of Connelly's statements, and their admission into evidence, did not violate the Constitution. *Id.; see also Thompson v. Battaglia*, 458 F.3d 614 (7th Cir. 2006) (The thrust of Thompson's suppression argument is that his confession was involuntary because it was the product of the same mental distress that led to the shootings. This argument fails as a matter of law because "a defendant's mental condition, by itself and apart from its relation to official coercion," cannot lead to a finding that a confession is involuntary); *United States v. Jones*, 359 F.3d 921 (7th Cir. 2004) (It is well established that mental state alone cannot render a confession involuntary; government coercion must also be a factor).

In the instant case, the defendant claims that because he was diagnosed schizophrenic in the 1970s and/or 1980s, the defendant's confessions are rendered involuntary. Based upon *Colorado v. Connelly*, that is incorrect. First, there was no coercive law enforcement activity in this case. The defendant was not physically harmed, was not deprived of food or water, and was not treated poorly in any respect. The interview only lasted an hour. Moreover, there was nothing in the defendant's demeanor, manner, or actions during his confessions which exhibited any symptoms of any psychological imbalance.

The defendant claims that the law enforcement officers told him that he would seek the death penalty if he did not give a statement and, conversely, that the defendant would not seek the death penalty if he did give a statement. Simply put, that is false and the government will present evidence at a hearing as to its falsity.

The defendant claims that because USP-Marion SIS Technician Mark Steinmetz was present, SIS Tech. Steinmetz "knew or should have known" about the defendant's history of mental illness. As a legal matter, that is irrelevant. In *Colorado v. Connelly*, the defendant told the law enforcement officer that in the past, the defendant had been a patient in several mental hospitals. Nonetheless, the Supreme Court held the defendant's confession was admissible because the defendant appeared to understand what he was saying and there was no coercion.

As a practical matter, SIS Technician Steinmetz did not know about the defendant's prior diagnosis. SIS Technician Steinmetz does not know, and cannot be held to know, the mental history of every single inmate at Marion Prison. According to SIS Technician Steinmetz, the inmate population at USP-Marion ranges from 950-1300 inmates at any time, with inmates constantly

arriving and leaving. Currently, there are approximately 1180 inmates at the prison. SIS Technician Steinmetz cannot be held responsible to know every single inmate's medical history.

The defendant claims that he was handcuffed during the interview and that makes his statement involuntary. However, simply being handcuffed does not make a statement involuntary. *See United States v. Vallar*, 635 F.3d 271, 283 (7th Cir. 2011) (statement voluntary where interview proceeded in Spanish and lasted two-and-a-half hours, and defendant was handcuffed for the duration of the interview); *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011) (once handcuffed, Richardson eagerly shared his expertise of past, present, and future Northwest Indiana drug deals with anyone who would listen. These statements were voluntary and thus admissible); *United States v. Doe,* 149 F.3d 634, 639 (7th Cir.1998) (holding that questioning a handcuffed defendant in the back of a police car in a remote location for more than an hour was not sufficient to render a waiver involuntary).

As stated above, the defendant was handcuffed because at the time he was interviewed by the agents, the defendant was considered to be on Special Housing Unit status pending investigation. BOP policy directs that inmates on Special Housing Unit status are handcuffed any time they are removed from their living quarters (assigned cell). Since the defendant was removed from the M-unit cell for interview, he was handcuffed.

Moreover, the defendant had just killed his cell mate in a heinous and gruesome manner a few hours earlier. That law enforcement officers decided to handcuff an inmate housed in a federal prison who was already serving a life sentence for murder, and who had just committed another killing, does not render the defendant's confession involuntary.

9

The defendant's December 2, 2009, statement to the FBI Agents and a BOP official is admissible.

**2. Defendant's December 2, 2009, Statement to Prison Psychologist**

Following the defendant's interview with the FBI agents, the defendant was interviewed by a psychologist (Marla Patterson, Ph.D), who works at USP-Marion. The defendant was not handcuffed during this interview because he was interviewed in his assigned cell in M-Unit. This second interview took place within approximately an hour of the interview by the FBI agents. The purpose of the interview was for a suicide risk assessment as to the defendant, not for law enforcement purposes. Dr. Patterson noted that the defendant was "oriented to time, place, person and circumstances." The defendant's speech was coherent, logical, and goal directed. The defendant did not appear to be actively hallucinating and his thought process appeared organized. The defendant's affect was calm and stable. The defendant's cognition and attention appeared intact. The defendant was responsive and alert. Dr. Patterson concluded that the defendant was at a low risk for suicide.

The defendant's statements to the psychologist are admissible for two reasons. First, the defendant was aware of his *Miranda* rights at the time he gave the statements and the psychologist did not need to re-read the defendant his *Miranda* rights. In *United States v. Edwards*, 581 F.3d 604, 607-608 (7th Cir. 2009), the Seventh Circuit held that *Miranda* warnings do not need to be re-read every time a defendant is questioned, especially if the time frame between the two interviews is relatively short. The Seventh Circuit stated:

> The cases do not require that the warnings be repeated after an interruption in the questioning, e.g., *United States ex rel. Patton v. Thieret,* 791 F.2d 543, 547–48

> (7th Cir.1986); *United States v. Ferrer–Montoya,* 483 F.3d 565, 569 (8th Cir.2007) (per curiam); *United States v. Rodriguez–Preciado,* 399 F.3d 1118, 1128–29 (9th Cir.2005); see also *Wyrick v. Fields,* 459 U.S. 42, 48–49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam), even if the interruption is much longer than it was in this case. *See, e.g.*, *United States v. Diaz,* 814 F.2d 454, 460 and n. 6 (7th Cir.1987) (several hours); *United States ex rel. Henne v. Fike,* 563 F.2d 809, 813–14 (7th Cir.1977) (per curiam) (nine hours); *People v. Dela Pena,* 72 F.3d 767, 769–70 (9th Cir.1995) (nearly fifteen hours); *Stumes v. Solem,* 752 F.2d 317, 320 (8th Cir.1985) (nearly five hours); *Jarrell v. Balkcom,* 735 F.2d 1242, 1253–54 (11th Cir.1984) (three hours). In *Thieret* the suspect was placed in a holding cell between the warnings and the defendant's waiver of his *Miranda* rights. In *Diaz* the warnings were given at the hotel where the suspect was arrested and his inculpatory statements came during the subsequent booking. In *Fike* the warnings were given in the evening and the statements the following morning, and the warnings and the interrogation were by different officers, as they were in *Jarrell* and in the present case. In *United States v. Pruden,* 398 F.3d 241, 247–48 (3d Cir.2005), roughly 20 hours and a change of location intervened between warnings and statement and the defendant was merely reminded before he made the statement that he had received the warnings the previous afternoon.
>
> \* \* \*
>
> The practical question is not whether *Miranda* warnings given to a defendant became "stale," or, though the courts love the phrase, whether the "totality of the circumstances" indicates that the inculpatory statement was made knowingly. It is whether the defendant when he gave the statement didn't realize he had a right to remain silent. The *Miranda* form told him he had that right, and the presumption should be that he would remember this even if some time had elapsed between his receiving the warnings and undergoing the questioning that elicited the inculpatory statement. The cases do not speak in terms of a presumption but that is the practical effect of their reluctance to attach dispositive weight to a break in questioning, even when the break is protracted and other circumstances might have made it less likely that the defendant would remember that he could stop the questioning at any time. The presumption can be rebutted but was not in this case.

*United States v. Edwards*, 581 F.3d 604, 607-608 (7th Cir. 2009). Thus, the defendant's statements to the psychologist were voluntarily given after the defendant had been advised of his *Miranda* rights, and after he waived those rights.

11

In addition, this second interview was not a custodial interrogation. The psychologist was conducting a risk assessment as to the likelihood that the defendant would commit suicide. The interview was not for purposes of law enforcement, but rather for the defendant's well-being.

### 3. January 15, 2010 Statement to SA Bratcher and SIS Technician Steinmetz

On January 15, 2010, the defendant was interviewed again at USP-Marion. Present in the room were FBI SA Ron Bratcher and USP-Marion SIS Technician Mark Steinmetz. At approximately 1:50 p.m., the defendant was advised of his *Miranda* rights. At approximately 1:51 p.m., the defendant verbally waived his *Miranda* rights. The defendant was handcuffed during the interview. A copy of the *Miranda* form used, as well as a notation that the defendant was handcuffed and unable to sign the document, is attached as Exhibit B.

As with the defendant's previous interview, during this second interview with and FBI Special Agent and a BOP official, the defendant was calm, coherent, and provided appropriate responses to questions. The defendant did not appear under the influence of any alcohol or drugs. The defendant gave a voluntary statement on January 15, 2010.

For the same reasons stated above with respect to the defendant's December 2, 2009, statement, the defendant's January 15, 2010, statement was voluntarily made after receiving and waiving his *Miranda* rights. Thus, the defendant's statement is admissible.

### 4. January 27, 2010 Letter Written by Defendant

The defendant sent a letter to USP-Marion SIS Technician Mark Steinmetz. The date on the letter was January 27, 2010. A copy of that letter is attached as Exhibit C.

Voluntary statements are not subject to *Miranda* warnings, and thus are admissible as evidence. *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). Statements are volunteered when they are not the result of "compelling influences, psychological ploys, or direct questioning." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (*citing Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987); *United States v. Jackson,* 189 F.3d 502, 510 (7th Cir.1999)).

This letter is a purely volunteered statement by the defendant. There is no evidence he was asked to write the statement or send the statement to SIS Technician Steinmetz. Moreover, this statement was not pursuant to any interrogation or coercion. For whatever reason, the defendant simply sent the letter to Mr. Steinmetz. There is no legal basis to suppress a purely volunteered statement to law enforcement.[1]

---

[1] Moreover, even if the defendant's letter was being sent to a non-attorney, prison officials could read the letter without violating the defendant's constitutional rights. *See United States v. Whalen*, 940 F.2d 1027 (7th Cir. 1991) (inmate letters not suppressed because prison officials do not violate the constitution when they read inmates' outgoing letters.).

## **Conclusion**

The Court will need to hold a brief hearing on the defendant's motion to suppress. The evidence at that hearing will establish that the defendant knowingly and voluntarily waived his *Miranda* rights and then gave various statements to law enforcement. Those statements are admissible.

Respectfully submitted,

STEPHEN R. WIGGINTON
United States Attorney


s/George A. Norwood
GEORGE A. NORWOOD
Assistant United States Attorney
402 West Main Street, Suite 2A
Benton, IL 62812
(618) 439-3808
Fax: (618) 439-2401
E-mail: george.norwood@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2013, I electronically filed

**GOVERNMENT'S RESPONSE TO**
**DEFENDANT'S MOTION TO SUPPRESS**

with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

Dan Schattnik

        Respectfully submitted,

        STEPHEN R. WIGGINTON
        United States Attorney


        s/George A. Norwood
        GEORGE A. NORWOOD