UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CLEVELAND J. WHITE FEATHER,<br><br>Defendant. | Case No. 11-cr-40060-JPG |

## MEMORANDUM AND ORDER

This matter comes before the Court on defendant Cleveland J. White Feather's motion to suppress statements (Doc. 100) because they were obtained in violation of his Fourth, Fifth and Sixth Amendment rights. The Government has responded to the motion (Doc. 105). On April 11, 2013, the Court held a hearing on the motion at which Federal Bureau of Investigations ("FBI") Special Agent ("SA") Isaac A. "Ron" Bratcher and United States Penitentiary, Marion, Illinois, ("USP-Marion") Chief Psychologist Marla Patterson, Ph.D., testified for the Government and the defendant testified on his own behalf.

### I.     General Background

White Feather has been an inmate in the Bureau of Prisons since 1979, when he was convicted of murder and received a life sentence. He has a lengthy history of mental illness, including a diagnosis of schizophrenia. In December 2009, White Feather was housed at USP-Marion. On December 2, 2009, after correctional officers found the dead body of White Feather's cellmate Robert Running Bear, law enforcement officers and Dr. Patterson questioned White Feather and obtained incriminating oral statements. These statements are reflected in documents produced by the Government bearing Bates numbers 076-83 and 1626-28. Law enforcement officers also obtained incriminating oral statements on January 15, 2010 (Bates

numbers 085-87), and White Feather sent a written letter to law enforcement on January 27, 2010 (Bates numbers 091-95). The Court will set forth in detail its factual findings surrounding these statements in its discussion of each statement.

On July 7, 2011, a grand jury indicted White Feather on one count of murder by a federal prisoner under a life sentence based on his alleged killing of Running Bear. The Government is not pursuing a death penalty sentence, and the case is set to be tried before a jury on April 22, 2013.

White Feather seeks to suppress all of the aforementioned statements under the theory that they were not voluntary because (1) he was not advised of and did not waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966), prior to the custodial interrogation that produced the statements, (2) his statements were not of his own free will but were instead the product of coercion by law enforcement officers, including threats of death penalty prosecution if he did not make a statement, and (3) he was not provided assistance of counsel during interrogation.

White Feather bears the initial burden of making specific factual allegations that would justify suppression and showing that there is a genuine issue of fact for hearing, which he has done. Thereafter, the Government bears the burden of proving by a preponderance of the evidence that White Feather's statements were given voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (government's burden to prove waiver of *Miranda* rights by a preponderance of the evidence); *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972) (government's burden to prove voluntariness of confession by a preponderance of the evidence); *United States v. Villalpando*, 588 F.3d 1124, 1128-29 (7th Cir. 2009) ("The burden is on the government to prove the voluntariness of [the defendant's] statements by a preponderance of the evidence.").

**II.     Analysis**

   A.     <u>Relevant Law</u>

As a preliminary matter, although White Feather's motion cites the Fourth, Fifth and Sixth Amendments, the allegations support only violations of his Fifth Amendment rights. White Feather does not complain of an unreasonable search or seizure of his body or property or the lack of probable cause for or defects in a warrant, so the Fourth Amendment is not in issue. Similarly, he does not complain about the lack of a speedy or public trial, an impartial jury, information about the charges against him, the ability to confront his accusers or obtain evidence in his favor, all of which are protected by the Sixth Amendment. To the extent the Sixth Amendment guarantees an accused the right to counsel, that right does not attach until the formal commencement of adversary judicial criminal proceedings against a defendant, *Kirby v. Illinois*, 406 U.S. 682, 689 (1972), that is, when he first appears before a judicial officer and is advised of the charges against him, *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 198-99 (2008). White Feather's complaints about lack of counsel relate only to events long before this criminal prosecution began, so his Sixth Amendment rights are not in issue. Thus, the Fifth Amendment provides the source of the rights about which White Feather complains in the pending motion to suppress.

The Fifth Amendment provides, among other things, that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966), the Supreme Court determined that the rule against self-incrimination attaches, and is "fully applicable during a period of custodial interrogation." The Supreme Court requires police to comply with certain prophylactic procedures before questioning an individual in custody:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479; *accord Moran v. Burbine*, 475 U.S. 412, 420 (1986); *Dickerson v. United Staes*, 530 U.S. 428, 435 (2000); *United States v. Snodgrass*, 634 F.3d 324, 327 (7th Cir. 2011). The *Miranda* requirements are constitutional, not simply an exercise of the Supreme Court's supervisory authority to regulate evidence. *Dickerson*, 530 U.S. at 438, 444.

An individual is "in custody" for *Miranda* purposes when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*). The determination requires an objective, two-part inquiry: "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (internal quotations omitted). Where the defendant is an inmate, he is not "in custody" simply because he is incarcerated. On the contrary, in that situation, the Court must ask, considering the totality of the circumstances, whether a reasonable inmate in the defendant's position would believe the interrogation setting added more restraints to his freedom than those posed by his ordinary incarceration. *United States v. Menzer*, 29 F.3d 1223, 1232 (7th Cir. 1994).

Statements gathered without giving *Miranda* warnings carry an irrebuttable presumption of involuntariness and are inadmissible in the prosecution's case in chief, even if seemingly voluntarily made by other standards. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). If a suspect invokes his rights under *Miranda*, he is not subject to further interrogation until counsel is present or until he initiates further discussions. *Edwards v. Arizona*, 451 U.S. 477, 484-85

4

(1981). If he fails to invoke his rights in an unambiguous way, the Fifth Amendment does not require law enforcement officers to refrain from questioning him. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010) (right to remain silent); *Davis v. United States*, 512 U.S. 452, 459-60 (1994) (right to counsel). However, if a suspect waives his rights after receiving the *Miranda* warnings, law enforcement officers are free to question him. *North Carolina v. Butler*, 441 U.S. 369, 372-76 (1979).

A defendant may expressly or impliedly waive his rights to remain silent and to have counsel present during interrogation. No formal or express waiver is necessary. *Berghuis*, 130 S. Ct. at 2261. On the contrary, it may be "implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id.* (quoting *Butler*, 441 U.S. at 373); *see United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002). "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 130 S. Ct. at 2262.

If the defendant questions the validity of a waiver, the government carries the burden of showing by a preponderance of the evidence, considering the totality of the circumstances, that a defendant knowingly, intelligently and intentionally waived these rights. *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986). In *Burbine*, 475 U.S. at 421, the Supreme Court set out a two-part test to determine the voluntariness of the waiver:

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been

5

waived.

(internal quotations and citations omitted). Thus, "[a] confession is voluntary if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856-57 (7th Cir. 2004) (internal quotations and citations omitted).

Coercion must be present before a waiver or confession will be found involuntary. *Connelly*, 479 U.S. at 167; *Snodgrass*, 635 F.3d at 328. To determine whether law enforcement coerced a defendant to waive his *Miranda* rights and give incriminating statements, the Court should consider such things as:

> The defendant's age, education, intelligence level, and mental state; the length of the defendant's detention, the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. Narcotics, alcohol, and fatigue also may be considerations in a particular case.

*Snodgrass*, 635 F.3d at 328 (internal quotations and citations omitted). Where the defendant claims a Government promise coerced him, he must show the promise was materially false and was sufficient to overcome his free will. *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009). While the defendant's mental condition is a factor to be considered in relation to whether there was law enforcement coercion, the mental condition by itself will not render a statement or waiver involuntary. *Connelly*, 479 U.S. at 164; *United States v. Jones*, 359 F.3d 921, 923 (7th Cir. 2004). Whether a defendant was coerced is judged from the perspective of a reasonable person in the defendant's position. *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001).

When a defendant voluntarily waives his *Miranda* rights, he need not be rewarned after

an interruption in the questioning so long as he realized when he gave the statement after the interruption that he had the right to remain silent. *United States v. Edwards*, 581 F.3d 604, 607 (7th Cir. 2009). The Seventh Circuit Court of Appeals has recognized a rebuttable presumption that a defendant remembers his rights even if some time had elapsed between the warnings and the later questioning. *Id.*

The Court now turns to examine each of the statements White Feather seeks to suppress.

B. December 2, 2009, Oral Statements to Law Enforcement Officers
(Bates Nos. 076-79 and 080-83)

The Court heard testimony from SA Bratcher and from White Feather about this interrogation. The Court found large portions of White Feather's testimony incredible in light of his demeanor while testifying, internal inconsistencies in his testimony and conflicts between his testimony and other more credible testimony. His demeanor and his giving some bizarre testimony (e.g., his belief that the tribal president of his Native American tribe could pardon him from his federal crime) suggested at times that he was not fully in touch with reality.[1] His testimony was internally inconsistent about the timing of the events leading up to the interrogation suggesting he is not a stickler for getting details right. For example, he testified that he spent five hours straight in handcuffs and then testified that his handcuffs were removed for substantial portions of those five hours. In addition, White Feather's testimony was inconsistent with that of other, more credible witnesses. For example, his testimony that his interview was tape recorded on a cassette tape was inconsistent and less credible that SA

---

[1]Based on counsels' representations at the final pretrial conference, it appears that defense counsel has obtained a psychological evaluation of White Feather and has investigated whether White Feather's competence to stand trial or sanity at the time of the offense could be viable defense theories in this case but has decided to pursue neither theory.

Bratcher's testimony that it was not recorded at all and that in December 2009 the FBI was exclusively using digital recording devices.  SA Bratcher, on the other hand, provided confident, coherent, consistent testimony while displaying a demeanor that indicated truthfulness.  Similarly, White Feather testified that he spoke with Dr. Patterson before the interrogation by SA Bratcher, but Dr. Patterson – a witness with no reason to lie or slant her testimony – had a clear memory of waiting for SA Bratcher to conclude his interview before she could see White Feather.  Finally, the Court notes that White Feather is already serving a life sentence and is likely not motivated by the fear of prosecution and incarceration for perjury that normally influences a witness to testify truthfully.  All of these factors together lead the Court to credit the testimony of SA Bratcher over the testimony of White Feather.

Based on the credible testimony, the Court finds that approximately four hours after Running Bear's body was found around 8:30 a.m. on December 2, 2009, White Feather was briefly examined in the health care unit and then taken to a cell in M-Unit.  About four hours later, he was handcuffed behind his back and taken to a space in center of the M-Unit where he was interviewed by SA Bratcher, FBI SA Scott Zmudzindki and USP-Marion Special Investigative Services ("SIS") Technician Mark Steinmetz (collectively, the "officers").  White Feather remained handcuffed behind his back during the interview.  The interview was not recorded on audio tape.  SA Bratcher orally read a written statement of the *Miranda* rights and the waiver of those rights to White Feather, asked him if he understood those rights, and asked him if he wanted to talk to the officers.  White Feather indicated he understood his rights and wanted to waive them, and then he began talking to the officers.  He was unable to make any written indication of waiver because he was handcuffed, which was noted on the written waiver form.  The officers questioned White Feather, and in response he gave incriminating statements.

At no time did they promise him the death penalty would not be pursued if he gave a statement or threaten that it would be pursued if he failed to give a statement. They made no other threats or promises either. They did not display any weapons or yell at White Feather. During the interview, White Feather never unambiguously (or even ambiguously, for that matter) invoked his right to counsel or to remain silent. White Feather did not appear to be under the influence of alcohol or drugs, appeared to understand what the officers were saying, and responded appropriately to the questions the officers asked him. His demeanor was calm, coherent and "matter of fact." White Feather's statements in this interview are reflected in documents bearing Bates Nos. 076-79 and 080-83. After about an hour of questioning, White Feather was returned to his cell in M-Unit.

Based on the totality of the circumstances, the Court finds White Feather explicitly – by his oral waiver – and implicitly – by his participation in the interrogation – waived his *Miranda* rights knowingly and voluntarily. At the time of the interrogation, White Feather was 50 years old and had obtained his GED. The officers informed White Feather of his *Miranda* rights, he stated he understood them, and he stated that he waived them. Thus, he had a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.

Furthermore, the credible evidence does not even suggest coercion by the officers. White Feather is a seasoned inmate – he has been incarcerated for 34 years – and was unlikely to be intimidated by being in handcuffs or in the prison setting, which was in essence his "home." The officers did not use threats, promises or intimidation, did not display any weapons, and only questioned White Feather for about an hour. Although he has a history of schizophrenia, White Feather appeared calm and coherent in his interactions with the officers, giving them no reason

9

to believe he was mentally ill or that their conduct could amount to coercion. Based on the totality of the circumstances, the Court finds that a reasonable person in White Feather's position would not have been coerced to waive his *Miranda* rights and that White Feather's waiver and subsequent statements were knowing and voluntary. Accordingly, the Court declines to suppress White Feather's statements to the officers on December 2, 2009.

  C. December 2, 2009, Oral Statements to Psychologist (Bates Nos. 1626-28)

The Court heard testimony from Dr. Patterson and from White Feather about this questioning. Again, the Court found White Feather's testimony about the sequence of the interrogations on December 2, 2009, incredible for many of the same reasons discussed above, especially his testimony's inconsistency with the confident and credible testimony of Dr. Patterson, a witness with no reason to lie. This leads the Court to credit Dr. Patterson's testimony over White Feather's.

Based on the credible testimony, the Court finds that following his interview with SA Bratcher, White Feather was returned to his cell in M-Unit and his handcuffs were removed. Dr. Patterson had been waiting for SA Bratcher's interview to conclude before talking to White Feather. Shortly after White Feather returned to the cell, she came to his cell and, from outside the cell, interviewed him to assess his risk for suicide. He was not handcuffed during the interview and never asked for an attorney or to stop the questioning. Although she was on the prison's mental health staff, Dr. Patterson was not aware of White Feather's history of mental health problems because prior to the interview, she had only consulted a USP-Marion intake screening form and summary, which did not reference any mental health problems or a recent history of suicide attempts, not White Feather's medical records. Dr. Patterson observed that

during the interview, White Feather was calm, alert, goal directed and responsive to her questions. He appeared to be thinking clearly, did not seem to be distracted by internal stimulation, and did not seem to be delusional. She did not advise him of his *Miranda* rights before beginning the interview. During the interview, White Feather made incriminating statements. Those statements are reflected in documents bearing Bates Nos. 1626-28. After speaking with White Feather for less than an hour, Dr. Patterson determined his risk for suicide was low.

It was not necessary to *Mirandize* White Feather because his questioning by Dr. Patterson was not custodial interrogation. During the interrogation, White Feather was uncuffed in a cell – his "home" environment – and Dr. Patterson was questioning him from outside the cell for the purpose of assessing his suicide risk. These circumstances would not have caused a reasonable inmate in White Feather's position to believe he was subject to more restraints on his freedom than posed by his ordinary incarceration or that he was not free to terminate the questioning when he wanted. Accordingly, he was not in custody.

Even if White Feather had been in custody, there was no need to rewarn him of his *Miranda* rights before questioning him. Dr. Patterson's interview came close on the heels of SA Bratcher's interview at which White Feather was advised of his rights. No evidence suggests White Feather did not remember the rights so recently read to him by SA Bratcher. His waiver of his *Miranda* rights given in his interview with SA Bratcher continued to be valid during the interview with Dr. Patterson.

    D.    <u>January 15, 2010, Oral Statements to Law Enforcement Officers (Bates Nos. 085-87)</u>

The Court heard testimony from SA Bratcher and from White Feather about this

interrogation. For the same reasons the Court found large portions of White Feather's testimony incredible with respect to his statements about the December 2, 2009, interview and found SA Bratcher's testimony credible, it also finds White Feather's testimony about the January 15, 2010, interview less credible that SA Bratcher's.

Based on the credible testimony, the Court finds that on the afternoon of January 15, 2010, White Feather was handcuffed behind his back and taken to an office in the Special Housing Unit where he was interviewed by SA Bratcher and SIS Technician Steinmetz (collectively, the "officers"). White Feather remained handcuffed behind his back during the interview. The interview was not recorded on audio tape. As on December 2, 2009, SA Bratcher orally read a written statement of the *Miranda* rights and the waiver of those rights to White Feather, asked him if he understood those rights, and asked him if he wanted to talk to the officers. White Feather indicated he understood his rights and wanted to waive them, and then the interview began. White Feather was unable to make any written indication of waiver because he was handcuffed, which was noted on the written waiver form. The officers questioned White Feather, and in response he gave incriminating statements. At no time did they promise him the death penalty would not be pursued if he gave a statement or threaten that it would be pursued if he failed to give a statement. They made no other threats or promises either. They did not display any weapons or yell at White Feather, and they did not tell him he needed to provide a written statement to accompany his oral statement in order to avoid a death penalty prosecution. During the interview, White Feather never invoked his right to counsel or to remain silent. Again, White Feather did not appear to be under the influence of alcohol or drugs, appeared to understand what the officers were saying, and responded appropriately to the questions the officers asked him. His demeanor was calm, coherent and "matter of fact." The

interview lasted less than an hour. White Feather's statements in this interview are reflected in documents bearing Bates Nos. 085-87.

The circumstances surrounding White Feather's statements on January 15, 2010, are indistinguishable in any meaningful way from those on December 2, 2009. As with the earlier interview, the totality of the circumstances on January 15, 2010, show that White Feather was aware of his *Miranda* rights and explicitly and implicitly waived them and gave a voluntary statement. He had a full awareness of both the nature of the rights he was abandoning and of the consequences of that decision. For the same reasons the Court found no coercion in the earlier interview, it finds no coercion occurred on January 15, 2010, to induce White Feather to waive his *Miranda* rights and make a statement to the officers. White Feather's waiver and subsequent statements were knowing and voluntary, and the Court declines to suppress White Feather's statements to the officers on January 15, 2010.

E. January 27, 2010, Written Statement (Bates Nos. 091-95)

The Court heard testimony from SA Bratcher and from White Feather about the events precipitating this written statement. For the same reasons the Court found large portions of White Feather's testimony incredible with respect to his statements about his interrogations and found SA Bratcher's testimony credible, it also finds White Feather's testimony about the circumstances leading to his January 27, 2010, written statement less credible that SA Bratcher's.

Based on the credible testimony and as noted above, the Court finds that at the January 15, 2010, interview, no officer asked White Feather to make a written statement and did not threaten him with a death penalty prosecution if he failed to make such a statement. On the contrary, White Feather's January 27, 2010, letter to SIS Technician Steinmetz was a voluntary

13

and spontaneous act by White Feather when he was not in custody for *Miranda* purposes and was not being interrogated. Thus, the letter was not the product of any custodial interrogation such that advice about *Miranda* rights was required. Nor was it the product of any conceivable coercion by the officers, who were not even present when White Feather wrote the letter. Accordingly, the Court declines to suppress the written statement on the grounds that it was obtained in violation of White Feather's Fifth Amendment rights.

### III. Conclusion

For the foregoing reasons, the Court finds White Feather's statements were knowing and voluntary and were not obtained by coercion. Accordingly, the Court **DENIES** White Feather's motion to suppress (Doc. 100) in its entirety.

**IT IS SO ORDERED.**
**DATED: April 16, 2013**

                                                s/ J. Phil Gilbert
                                                **J. PHIL GILBERT**
                                                **DISTRICT JUDGE**